987 F.2d 154
 61 USLW 2497, 28 Collier Bankr.Cas.2d 440,
23 Bankr.Ct.Dec. 1537, Bankr. L. Rep. P 75,104
 JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY,
Creditors Committee, Creditor,
v.
ROUTE 37 BUSINESS PARK ASSOCIATES,
Route 37 Business Park Associates, Debtor,
US Trustee, Trustee,
John Hancock Mutual Life Insurance Company, Appellant.
 No. 92-5100.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 7, 1992.
Decided Jan. 22, 1993.
Sur Petition for Rehearing Feb. 19, 1993.
 
 Sheppard A. Guryan (argued), Lasser, Hochman, Marcus, Guryan and Kuskin, Roseland, NJ (Sheppard A. Guryan, of counsel; Bruce H. Snyder, on the brief), for appellant, John Hancock Mut. Life Ins. Co.
 Frank J. Vecchione (argued), Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ (Frank J. Vecchione, of counsel; David N. Crapo, on the brief), for appellee, Route 37 Business Park Associates.
 Before: GREENBERG, ALITO, and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALITO, Circuit Judge:
 
 
 1
 This is an appeal by a creditor, John Hancock Mutual Life Insurance Company ("Hancock"), that seeks to foreclose on a mortgage on property owned by Route 37 Business Park Associates ("debtor"), which has filed a voluntary Chapter 11 petition. The bankruptcy court denied Hancock's motion for relief from the bankruptcy automatic stay, and the district court affirmed. 146 B.R. 640. We hold that Hancock's motion was incorrectly denied because the debtor's proposed plan contains an impermissible classification scheme for unsecured claims and thus has no reasonable prospect of confirmation. We will, therefore, reverse the order of the district court.
 
 I.
 
 2
 The debtor is a New Jersey partnership with three partners, all individuals. The partnership's main asset is an industrial and commercial park located on Route 37 in Toms River, New Jersey. In 1989, the debtor obtained a loan of $5,700,000 from Hancock to refinance the park. The loan is secured by a non-recourse first mortgage on the park.[1] The debtor failed to make several interest and tax payments, and in November 1990 Hancock began foreclosure proceedings in state court. A short time later, the debtor filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. Pursuant to 11 U.S.C. § 362(a) (1988), the petition operated as a stay of the foreclosure proceedings.
 
 
 3
 In March 1991, Hancock moved for relief from the stay under 11 U.S.C. § 362(d)(1) and (2) (1988). The first provision on which Hancock relied, Section 362(d)(1), requires a bankruptcy court to grant relief if the creditor would not otherwise have "adequate protection" of an interest in the property in question. Hancock contended that its interest in the business park was not adequately protected, but this argument was rejected by the bankruptcy and district courts and is not before us in this appeal.
 
 
 4
 The other provision on which Hancock relied, Section 362(d)(2), requires a bankruptcy court to grant relief from the automatic stay if the debtor has no equity in the property and the "property is not necessary to an effective reorganization." The debtor stipulated that it had no equity in the property, and therefore the critical question was whether the property was "necessary to an effective reorganization."
 
 
 5
 Before the district court ruled on Hancock's motion, the debtor filed a proposed plan of reorganization[2] and a disclosure statement. The disclosure statement listed Hancock's claim as approximately $5.9 million and listed the book value of the property as approximately $2.4 million and the liquidation value as $2.2 million. Since Hancock's claim was undersecured, the plan treated that claim in accordance with 11 U.S.C. § 506(a) (1988),[3] dividing it into a secured claim of $2.2 million and an unsecured deficiency claim of $3.7 million. The plan stated that this treatment would be modified if Hancock elected under 11 U.S.C. § 1111(b)(2) (1988) to have its entire claim treated as secured.[4]
 
 
 6
 The plan proposed to create three classes of claims that are relevant for present purposes. Class Two consisted of the secured portion of Hancock's claim. Class Three was made up of all the unsecured claims other than Hancock's; these were estimated to total about $492,000. Class Four consisted of Hancock's unsecured claim of approximately $3.7 million. The plan called for identical payments on the Class Three and Four claims. Specifically, the plan stated that, unless Hancock made the election under 11 U.S.C. § 1111(b)(2) (1988), all of the holders of these claims were to receive 2.5% of their claims without interest 12 months after the effective date of the plan and another 2.5% without interest 12 months after that.
 
 
 7
 The plan also called for formation of a new, limited partnership called "Newco" to execute the plan. Newco's general partner was to be a corporation, and one or more of the debtor's partners were to be limited partners. The limited partners were to receive equity interests in Newco "in consideration, among other things, for the infusion of funds and other new value." The plan did not specify the amount that any of the partners would contribute.
 
 
 8
 Hancock argued that it was entitled to relief from the stay under 11 U.S.C. § 362(d)(2) (1988) because the plan improperly placed Hancock's unsecured claim and the other unsecured claims into two separate classes and consequently could not be confirmed. At a hearing in July, however, the bankruptcy court ruled that there was a reasonable possibility that the classification would be sustained at a confirmation hearing.
 
 
 9
 After a hearing in late August, the bankruptcy court ruled on Hancock's additional argument that the absolute priority rule set out in 11 U.S.C. § 1129(b)(2)(B)(ii) (1988) also prohibited confirmation of the plan because the plan allowed holders of junior claims (the debtor's partners) to receive or retain property (equity interests in Newco). The debtors responded that this feature of the plan was permitted by the "new value exception" to the absolute priority rule. Ruling in favor of the debtor, the bankruptcy court held that this exception had not been eliminated by the enactment of the Code and that there was a reasonable possibility the plan could satisfy this exception.
 
 
 10
 On appeal, the district court affirmed. It refused to disturb the bankruptcy court's ruling regarding the classification of unsecured claims, but it expressed skepticism "whether the classification proposed by the partnership would pass muster at a confirmation hearing." The district court stated that "[t]he plan does present the appearance of classifying claimants purely on the basis of circumventing the requirements of [11 U.S.C.] § 1129(10)."
 
 
 11
 The district court also held that the "new value" exception continues to apply under the Code. While the court found it "unlikely that the plan [would] ultimately satisfy the requirements of the new value exception at a confirmation hearing," it refused to overturn the bankruptcy court's decision with respect to this issue.
 
 
 12
 Hancock then took the present appeal. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291 (1988). Our decisions apply a pragmatic interpretation of finality in bankruptcy cases. See In re Market Square Inn, Inc., 978 F.2d 116 (3d Cir.1992). Although "in some instances an order denying relief from the automatic stay may not be final and thus may not be appealable as of right to the district court" (In re West Elecs., Inc., 852 F.2d 79, 82 (3d Cir.1988)), we conclude that the order in this case was pragmatically final. See Eddleman v. United States Dep't. of Labor, 923 F.2d 782, 785 (10th Cir.1991). We review a bankruptcy court's factual findings for clear error, and we exercise plenary review with respect to questions of law. In re Jersey City Medical Ctr., 817 F.2d 1055, 1059 (3d Cir.1987).
 
 II.
 
 13
 A. Hancock contends that the bankruptcy court was required under 11 U.S.C. § 362(d)(2)(B) (1988) to grant relief from the automatic stay so that it could proceed with foreclosure in state court. Section 362(d)(2) requires a bankruptcy court, "[o]n request of a party in interest and after notice and a hearing," to grant relief from an automatic stay with respect to "an act against property" (such as foreclosure) if
 
 
 14
 (A) the debtor does not have an equity in such property; and
 
 
 15
 (B) such property is not necessary to an effective reorganization.
 
 
 16
 In this case, as previously noted, the debtor agrees that it has no equity in the property, and therefore the dispositive question is whether the property is necessary for an effective reorganization. In United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd, 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (citation omitted), the Supreme Court explained that this means that the debtor must show that there is " 'a reasonable possibility of a successful reorganization within a reasonable time.' " As a bankruptcy court aptly observed in a recent opinion, while "a lift stay hearing should not be transformed into a confirmation hearing," "[t]he 'effective reorganization' requirement enunciated by the Supreme Court ... require[s] a showing by a debtor ... that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." In re 266 Washington Assocs., 141 B.R. 275, 281 (Bankr.E.D.N.Y.1992), aff'd, 147 B.R. 827 (E.D.N.Y.1992). We must therefore consider whether the plan proposed in this case patently violates the Code's requirements for confirmation.
 
 
 17
 Section 1129 of the Code provides two different methods for confirming a reorganization. The first requires approval by all impaired classes. 11 U.S.C. § 1129(a) (1988). The second, the so-called "cram down" method, requires approval by at least one impaired class.[5] The debtor in this case would like to use the "cram down" method but admits that it cannot do so unless Hancock's unsecured deficiency claim is placed in a class of its own. Appellee's Br. at 18. Thus, confirmation of the debtor's plan is dependent on the permissibility of such a classification scheme.
 
 
 18
 Unfortunately, the Code does not expressly address the question presented by such a scheme. The provision of the Code that sets out the general rule regarding the classification of claims, Section 1122(a), expressly provides only that claims that are not "substantially similar" may not be placed in the same class; Section 1122(a) does not expressly provide that "substantially similar" claims may not be placed in separate classes.
 
 
 19
 Nevertheless, it seems clear that the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes. The critical confirmation requirements set out in Section 1129(a)(8) (acceptance by all impaired classes) and Section 1129(a)(10) (acceptance by at least one impaired class in the event of a "cram down") would be seriously undermined if a debtor could gerrymander classes. A debtor could then construct a classification scheme designed to secure approval by an arbitrarily designed class of impaired claims even though the overwhelming sentiment of the impaired creditors was that the proposed reorganization of the debtor would not serve any legitimate purpose. This would lead to abuse of creditors and would foster reorganizations that do not serve any broader public interest.
 
 
 20
 With these considerations in mind, we held in Matter of Jersey City Medical Ctr., 817 F.2d 1055, 1061 (3d Cir.1987), that "the classification of the claims or interests must be reasonable." We stated that the Code does not necessarily prohibit the placement of similar claims in different classes (id.), but we quoted the following observation with approval:
 
 
 21
 [T]here must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court]. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.
 
 
 22
 Id., quoting In re U.S. Truck Co., Inc., 800 F.2d 581, 586 (6th Cir.1986) (footnote omitted).[6]
 
 
 23
 Applying these standards in Jersey City Medical Ctr., we reviewed a classification scheme that created three impaired classes of unsecured claims[7]--one consisting of the claims of alleged medical malpractice victims, one consisting of employee benefit plan non-priority claims, and one consisting of the claims of other unsecured creditors.[8] Approving this scheme, our opinion stated without further elaboration (817 F.2d at 1061): "We immediately note the reasonableness of distinguishing the claims of ... medical malpractice victims, employee benefit plan participants, and trade creditors."
 
 
 24
 While our opinion in Matter of Jersey City Medical Ctr. did not spell out the factors that should be considered in determining whether a classification scheme is reasonable, it seems clear to us that this determination must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed (see 11 U.S.C. § 1129(a)(8), (10) (1988)) and treatment of claims under the plan (see 11 U.S.C. § 1123(a)(4) (1988)). Thus, where, as in this case, the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10) (1988).
 
 
 25
 B. Three other courts of appeals recently considered cases involving reorganization plans very similar to the one proposed by the debtor in this case, and all three courts found the classification schemes in those plans to be improper.
 
 
 26
 In Matter of Greystone III Joint Venture, 948 F.2d 134 (5th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), an insurance company loaned $8.8 million to a joint venture for the purchase of an office building, and the insurance company received a non-recourse promissory note secured by a first lien on the property. When the joint venture defaulted on the loan, the insurance company began foreclosure, and the joint venture then filed a Chapter 11 petition. Because the value of the building had fallen to approximately $5.8 million, the debtor's plan divided the insurance company's claim into a secured claim of $5.8 million and an unsecured deficiency claim of $3.5 million. Moreover, the plan placed the latter, unsecured claim in a class separate from the other unsecured claims, which totalled $10,000.
 
 
 27
 Reviewing this scheme, the Fifth Circuit wrote that "the one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification" is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." Id. at 139. The court considered the debtor's contention that its classification scheme was permissible because of a " 'legal difference' " between the insurance company's claim and those of the trade creditors, namely, that the insurance company's claim was non-recourse under state law and had been converted into a claim against the debtor personally only by virtue of Section 1111(b)(1)(A) of the Code, whereas the trade creditors had claims against the debtor under state law. 948 F.2d at 139-40. The court rejected this argument for essentially two reasons. First, the court observed that "state law is irrelevant where, as here, the Code has eliminated the legal distinction between non-recourse deficiency claims and other unsecured claims." Id. at 139. Second, the court concluded that placing the insurance company's unsecured claim in a separate class improperly abridged its right to vote on confirmation. Id. at 140. The court noted that 11 U.S.C. § 1111(b) (1988) permits a creditor with a non-recourse loan to "elect recourse status and obtain the right to vote in the unsecured class" or "to forego recourse to gain an allowed secured claim for the entire amount of the debt." Id. The court reasoned (id.):
 
 
 28
 If separate classification of unsecured deficiency claims arising from non-recourse debt were permitted solely on the ground that the claim is non-recourse under state law, the right to vote in the unsecured class would be meaningless. Plan proponents could effectively disenfranchise the holders of such claims by placing them in a separate class and confirming the plan over their objection by cramdown. With its unsecured voting rights effectively eliminated, the electing creditor's ability to negotiate a satisfactory settlement of either its secured or unsecured claims would be seriously undercut.
 
 
 29
 After finding that the debtor's other justifications for the classification scheme also lacked merit,[9] the court held that the scheme was improper and that the bankruptcy and district courts should not have approved it.
 
 
 30
 Like Greystone, In re Bryson Properties, XVIII, 961 F.2d 496 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992), involved a debtor that filed a Chapter 11 petition after receiving notice of the lender's intent to foreclose. The plan placed this lender's unsecured deficiency claim for approximately $3.3 million in one class and other unsecured claims, which totalled less than $100,000, in two other classes. The court noted that similar claims may not be classified separately for the sole purpose of obtaining approval by an impaired class and observed that "[w]here all unsecured claims receive the same treatment in terms of the Plan distribution, separate classification on the basis of natural and unnatural recourse claims is, at a minimum, highly suspect" and could not be sustained without some further justification. Id. at 502. Concluding that the debtor had failed to offer any proper explanation for splitting up the unsecured claims, the court held that the classification scheme was "clearly for the purpose of manipulating voting and it may not stand." Id.
 
 
 31
 Finally, in Matter of Lumber Exch. Bldg. Ltd. Partnership, 968 F.2d 647 (8th Cir.1992), a debtor obtained a $20 million nonrecourse loan from an insurance company secured by a mortgage on a building. After the debtor defaulted and foreclosure was begun, the debtor filed a Chapter 11 petition and submitted a plan that classified the insurance company's unsecured deficiency claim of approximately $14 million separately from the claims of unsecured trade creditors, which totalled about $450,000. The bankruptcy court granted the insurance company's request for relief from the automatic stay, holding, among other things, that the debtor "could not propose a confirmable reorganization plan without impermissibly classifying the creditors." Id. at 648. In addition, the bankruptcy court subsequently dismissed the Chapter 11 case for lack of a confirmable case. Id. The district court affirmed both the relief from the automatic stay and the dismissal (id.), and the court of appeals also affirmed.
 
 
 32
 Noting that similar claims may not be classified separately solely to obtain approval by an impaired class (id. at 649), the court of appeals rejected all of the debtor's proffered reasons for the classification. Among other things,[10] the court held that an unsecured deficiency claim may not be classified separately on the ground that it "arose by operation of law under 11 U.S.C. § 1111(b), whereas the trade creditors bargained for recourse debt...." Id. at 649. "How the claims of the [insurance company] and the trade creditors achieved their status," the court commented, "does not alter their current legal character and thus does not warrant separate classification." Id.[11]
 
 
 33
 C. In light of the general standards concerning classification schemes and the decisions of other courts of appeals in similar cases, we hold that the plan proposed in the present case had no reasonable prospect of confirmation and that Hancock's lift stay motion therefore should have been granted. The debtor advances two justifications for its classification scheme, but we find merit in neither.
 
 
 34
 The debtor argues that Hancock's unsecured claim against the debtor is different from the unsecured claim of trade creditors because Hancock, unlike the trade creditors, would not enjoy the right to proceed against the debtors' general partners under state law. This reliance on state law is curious since Hancock moved for relief from the automatic stay in order to pursue its state-law rights and the debtor opposed the motion in order to prevent Hancock from doing so. In any event, we cannot accept this justification of the classification scheme because it begs the relevant question: why is this a reasonable scheme for measuring creditors' votes? The debtor's explanation, based on the rights that Hancock would have under state law if freed from the strictures of the Bankruptcy Code, is entirely beside the point. In addition, that explanation is essentially the same as those rejected by the Fifth and Eighth Circuits in the cases described above, and we agree with their analysis.
 
 
 35
 The debtor also offers the following justification for its classification scheme. The debtor asserts that holders of unsecured deficiency claims often have an interest in voting to defeat any plan so that they can obtain relief from the automatic stay and foreclose, whereas holders of other unsecured claims often have an interest in voting to accept reorganization because they may receive nothing if relief from the automatic stay is granted or the debtor is liquidated. If the unsecured deficiency claim were placed in the same class as the other unsecured claims, the debtor maintains, the deficiency claim would " 'dilute' " and " 'dominate[ ] the vote of those truly acting in their interests as unsecured creditors.' " Appellee's Br. at 23, quoting In re Bjolmes Realty Trust, 134 B.R. 1000, 1004 (Bankr.D.Mass.1991).
 
 
 36
 While this argument relates to voting, we nevertheless find it unpersuasive. The distinction between those who do and do not "truly act[ ] in their interests as unsecured creditors" finds no support in the Code and seems inconsistent with economic reality. Absent bad faith or illegality (see 11 U.S.C. § 1126(e) (1988)), the Code is not concerned with a claim holder's reason for voting one way or the other, and undoubtedly most claim holders vote in accordance with their overall economic interests as they see them. Moreover, even if the concept of an unsecured creditor that truly acts in its interest as an unsecured creditor were meaningful, it is not apparent that trade creditors, who made up the bulk of the other unsecured creditors in this case, would fall within this concept any more than holders of unsecured deficiency claims. Trade creditors are often thought to vote their unsecured claims in order to further their interests as potential future suppliers of goods and services to the debtor. Thus, they could be said to be voting to further their interests as future contractors with the debtor rather than their interests as unsecured creditors.
 
 
 37
 Finally, the debtor emphasizes that the question before the bankruptcy judge was not whether the plan should be confirmed but merely whether to grant Hancock's lift stay motion. The debtor contends that it "was not required to present during Hancock's lift stay motion the evidence and proofs which are required under § 1129 for confirmation of a Plan." Appellee's Br. at 5. We agree that the debtor was not required to present such evidence, but the debtor was required to present its reasons for the classification scheme. The debtor drew up the proposed plan; it knew why it devised the classes that the plan contains; therefore explaining those reasons to the bankruptcy court at the hearings on the lift stay should not have constituted a burden. If the debtor had offered reasons that created a reasonable possibility of confirmation, we would hold that the lift stay motion was properly denied. We find, however, that the explanations advanced by the debtor are invalid as a matter of law, and therefore no evidence that the debtor could offer at a confirmation hearing could cure their flaws. Accordingly, since we see no reasonable possibility of confirmation, we hold that the lift stay order should have been granted.[12]
 
 
 38
 We will therefore reverse the order of the district court and remand this case for further proceedings consistent with our opinion.
 
 SUR PETITION FOR REHEARING
 
 39
 Feb. 19, 1993.
 
 
 40
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and ALDISERT,* Circuit Judges.
 
 
 41
 The petition for rehearing filed by appellee in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the Court in banc, the petition for rehearing is denied.
 
 
 42
 Because the mortgage is non-recourse, Hancock is permitted under state law to foreclose on the property but may not look to other assets of the partnership or the partners in order to recover any portion of the debt not satisfied by the proceeds of the foreclosure. See Life Ins. Co. of Va. v. Hocroft Assocs., 256 N.J.Super. 328, 606 A.2d 1150, 1152 (1992). Cf. 5 Collier on Bankruptcy p 1111.02 (Lawrence P. King ed., 15th ed. 1992).
 
 
 
 [2]
 In their briefs, the parties state that the debtor later proposed revised plans. However, the bankruptcy and district courts relied in their determinations on the debtor's initial plan, and the parties' appellate arguments also focus on that plan. We therefore also base our decision on the initial plan alone
 
 
 [3]
 Section 506(a) provides in pertinent part that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." See Sapos v. Provident Inst. of Sav., 967 F.2d 918, 921 (3d Cir.1992)
 
 
 [4]
 Once an undersecured creditor elects to have its entire claim treated as secured, it must then receive deferred cash payments that total at least the value of the allowed secured claim and that have a present value equal to the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II) (1988)
 
 
 [5]
 Under this method, the plan must also satisfy all of the requirements of 11 U.S.C. § 1129(a) (1988) except for subsection (a)(8) (which requires approval by all impaired classes) and must not "discriminate unfairly" against and must be "fair and equitable" with respect to all impaired classes that do not approve the plan. 11 U.S.C. § 1129(b) (1988)
 
 
 [6]
 The general principles discussed in Matter of Jersey City Medical Ctr., supra, are consistent with pre-Code law. As the Supreme Court recently noted, pre-Code law provides an important interpretive tool when there are ambiguities or gaps in the Code and when Congress has not indicated in the Code itself or in the legislative history that it intended to alter the previously applicable law. See Dewsnup v. Timm, --- U.S. ----, ---- - ----, 112 S.Ct. 773, 778-79, 116 L.Ed.2d 903 (1992)
 In corporate reorganizations under Chapter X of the former Bankruptcy Act, both Section 197, 11 U.S.C. § 597 (1940), and former Rule 10-302 (1976) required the judge to divide creditors and stockholders into classes "according to the nature of their respective claims and stock." These provisions were interpreted to require as a general rule that claims of the same kind and rank be placed in the same class. See Scherk v. Newton, 152 F.2d 747, 750-51 (10th Cir.1945); Mokava Corp. v. Dolan, 147 F.2d 340, 344 (2d Cir.1945); Kyser v. MacAdam, 117 F.2d 232, 237 (2d Cir.1941); In re Palisades-on-the-Desplaines, 89 F.2d 214, 217 (7th Cir.1937); In re Los Angeles Land & Invs., Ltd., 282 F.Supp. 448, 453 (D.Haw.1968), aff'd, 447 F.2d 1366 (9th Cir.1971); 6 Collier on Bankruptcy p 9.10 at 1601 (James W. Moore ed., 14th ed. 1978). However, the editors of Collier on Bankruptcy and some other commentators advocated limited exceptions to this general rule, and their position found at least some support in caselaw. See 6 Collier on Bankruptcy, p 9.10 at 1604 & n. 47 (14th ed. 1978) (citing commentators and cases).
 In arrangements with creditors under Chapter XI of the former Act, the debtor proposed the arrangement, but the court had the authority to determine whether any classification scheme was proper. See 11 U.S.C. § 751 (1940) (providing that the court "may fix the division of creditors into classes"); In re Hudson-Ross, Inc., 175 F.Supp. 111 (N.D.Ill.1959) (test of reasonableness).
 Neither the text of the current Code nor its legislative history shows that Congress meant to change the prior law regarding the classification of claims in reorganization plans. On the contrary, both the Senate and House reports stated that 11 U.S.C. § 1122 was meant to codify pre-Code law. S.Rep. No. 989, 95th Cong., 2d Sess. 118 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5904; H.R.Rep. No. 595, 95th Cong., 2d Sess. 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6362.
 
 
 [7]
 The plan also created a fourth class of unsecured claims (physicians' claims), but these were apparently not impaired. 817 F.2d at 1058
 
 
 [8]
 Although these creditors' claims against the debtor were impaired, the plan specifically preserved the creditors' rights to proceed against third parties, including the City of Jersey City. 817 F.2d at 1058
 
 
 [9]
 The court rejected the argument that the scheme was proper because it promoted "the Code's policy of facilitating reorganization" (id. at 140), as well as the contention that separate classification of trade creditors could be justified because of the need to preserve their good will. Id. at 140-41. The court found that this latter argument "fail[ed] to distinguish between the classification of claims and the treatment of claims," and the court noted that the plan treated the claims of the trade creditors the same as the claim of the insurance company. Id. at 141
 
 
 [10]
 In addition to the argument described in the text, the court rejected the contention that the classification scheme was needed to maintain good business relations with trade creditors and the argument that separate classification was necessary "in order to satisfy the fairness condition to cramdown." 968 F.2d at 649
 
 
 [11]
 Like these courts of appeals decisions, several recent district court and bankruptcy court decisions have found similar plans to be improper. See, e.g., In re Briscoe Enterprises, Ltd., II, 138 B.R. 795 (N.D.Tex.1992); In re Boston Post Rd. Ltd. Partnership, 145 B.R. 745 (Bankr.D.Conn.1992); In re Willows Convalescent Ctrs. Ltd. Partnership, 151 B.R. 220 (D.Minn.1991); In re Cantonwood Assocs. Ltd. Partnership, 138 B.R. 648 (Bankr.D.Mass.1992); Piedmont Assocs. v. Cigna Property & Casualty Ins. Co., 132 B.R. 75 (N.D.Ga.1991); In re Valrico Square Ltd. Partnership, 113 B.R. 794 (Bankr.S.D.Fla.1990); In re Waterways Barge Partnership, 104 B.R. 776 (Bankr.N.D.Miss.1989); In re Ward, 89 B.R. 998 (Bankr.S.D.Fla.1988); In re Caldwell, 76 B.R. 643 (Bankr.E.D.Tenn.1987). But see In re Johnston, 140 B.R. 526 (Bankr. 9th Cir.1992); In re Creekside Landing, Ltd., 140 B.R. 713 (Bankr.M.D.Tenn.1992); In re General Homes Corp., FGMC, 134 B.R. 853 (Bankr.S.D.Tex.1991); In re 11,111 Inc., 117 B.R. 471 (Bankr.D.Minn.1990); In re Mortgage Investment Co. of El Paso, 111 B.R. 604 (Bankr.W.D.Tex.1990)
 
 
 [12]
 In light of this holding, we need not and do not consider whether the absolute priority rule would also bar confirmation
 
 
 *
 As to panel rehearing only